UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


LIONEL MONSANTO

v.                                                    C.A. NO. 1:16-cv-00147

STATE OF RHODE ISLAND,
*by and through its* SECRETARY OF
TREASURY, SETH MAGAZINER;
JAMES DONNELLY TAYLOR, *Individually and*
*in his official capacity*; GREGORY PALMER,
*Individually and in his official capacity;* RHODE
ISLAND STATE POLICE;
COLONEL STEVEN G. O'DONNELL,
*Individually and in his official capacity*


v.

GOVERNOR GINA RAIMONDO, *in her*
*official capacity*; DIRECTOR OF
DEPARTMENT OF ADMINISTRATION
MICHAEL DIBIASE, *in his official capacity*;
ATTORNEY GENERAL PETER KILMARTIN,
*individually and in his official capacity*

**STATEMENT OF UNDISPUTED FACTS**
**SUBMITTED BY STATE OF RHODE ISLAND, GREGORY PALMER,**
**THE RHODE ISLAND STATE POLICE AND COLONEL STEVEN G. O'DONNELL**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**


1. At all material times hereto, Defendants James Donnelly Taylor (hereinafter "Taylor") and

   Gregory Palmer (hereinafter "Palmer") were employed by the Rhode Island State Police as

   Rhode Island State Troopers.  (Complaint paragraphs 6, 7).[1]  Taylor attended the 2009 State

---

[1] All references herein and in the Memorandum are to Plaintiff's Third Amended Complaint,
Docket Entry No. 26, filed on February 3, 2017.

Police Training Academy (Exh. A--Taylor depo. 21)[2], and Palmer attended the 2011 Academy (Exh. B--Palmer depo. 167).

2. At all material times hereto, Steven G. O'Donnell was the Superintendent and Commissioner of the Department of Public Safety for the Rhode Island State Police. (Complaint, para. 11).[3] The Department of Public Safety is responsible for the management and administration of the Office of Capitol Police, the State fire marshal, the E-911 emergency telephone system division, the Rhode Island state police, the Municipal police training academy, and the Division of sheriffs. R.I. Gen. Laws 42-7.3-3. The Department of Public Safety is comprised of five hundred thirty-eight (538) total employees consisting of four hundred thirty-nine (439) sworn employees and ninety-nine (99) civilian employees. (Exh. C--Affidavit of Lt. Col. Kevin Barry p. 5).

3. On February 26, 2014, at approximately 1:30 a.m., Plaintiff Lionel Monsanto ("Monsanto") was operating a 2001 Mercury Mountaineer in the City of Pawtucket. (Complaint para. 12; Exh. D--Monsanto depo. 7, 25). The windows of the SUV that Monsanto was driving were tinted on the side and back windows. (Exh. D--Monsanto depo. 26; Exh. A--Taylor depo. 21). Monsanto was not the owner of the vehicle. (Exh. D--Monsanto depo. 26).

4. On February 26, 2014, at approximately 1:30 a.m. Troopers Taylor and Palmer were working as Rhode Island State Troopers in Pawtucket, when they noticed a vehicle speed by them—that vehicle was later determined to be operated by Monsanto. When the vehicle passed the Troopers, Taylor (the driver of the State Police cruiser) felt his car shake and said something.

---

[2] Relevant portions of transcripts have been attached in support of the instant Motion. Hereinafter, they will be referenced as follows: (Exh. (letter), (Name) depo (page number)).
[3] All references herein and in the Memorandum are to Plaintiff's Third Amended Complaint, Docket Entry No. 26, filed on February 3, 2017.

Taylor believed there was a possibility that the driver of the vehicle was impaired. (Exh. A--Taylor depo. 16-20).

5. The troopers were stopped at a well-lit gas station when Monsanto's vehicle drove past on a service road.    (Exh. A--Taylor depo. 17).

6. Monsanto saw the troopers as they were at the gas station and knew they were white.  (Exh. D--Monsanto depo. 37-39).

7. Taylor wanted to further investigate whether the driver had been drinking, so the Troopers got into their police cruiser and followed Monsanto onto I-95 and eventually pulled him over for speeding.  (Exh. A--Taylor depo. 18-19, 24-25).  Palmer was not driving the cruiser, but estimated by "clocking" Monsanto's vehicle that he was going over the posted 55 mph speed limit. (Exh. B--Palmer depo. 41, 48-51). Plaintiff's expert agrees that it is possible to gauge speed without radar, and that it is possible to gauge the speed of a vehicle using light posts. (Exh. E--Rivera depo. 141).

8. During the stop, there was traffic on I-95 at that time, and some noise.  (Exh. D--Monsanto depo. 50; Exh. F--Roadside Video).

9.  Monsanto is African-American, as was his passenger Marciel Bates.  (Complaint para. 17).

10. At that time in the morning (1:50 a.m.) on the highway, Palmer was not able to identify whether the occupants of the vehicle were black or white until he approached the window, even with the headlights on. (Exh. B--Palmer depo. 54-55).   The first time Palmer noticed the race of either the driver or the passenger was after the vehicle was stopped along the side of I-95.  (Exh. B--Palmer depo. 41, 59-61).

11. Monsanto does not know what the troopers were talking about in their car when they began their pursuit.  (Exh. D--Monsanto depo. 65).

12. Taylor initially approached Plaintiff's vehicle on the passenger side away from I-95. Taylor then asked for Monsanto's license and registration. (Exh. A--Taylor depo. 27-28). Monsanto began to loudly demand to know why he was being pulled over. (Complaint para. 19; Exh. D--Monsanto depo. 49, 52; Palmer depo 62-63; Exh. A--Taylor depo. 27-29; Exh. F--Roadside Video).

13. Initially, during the stop Trooper Palmer stood towards the rear passenger's side of the Plaintiff's vehicle watching traffic and glancing towards Trooper Taylor's interaction with Plaintiff. (Exh. B--Palmer depo. 62). Trooper Palmer recalls Plaintiff getting loud and aggressive, demanding and screaming, asking why he was being stopped. (Exh. B--Palmer depo. 62-63).

14. Taylor took Plaintiff's information, went back to the cruiser, returned and informed Plaintiff that he had been pulled over for speeding. (Complaint. para 20; Exh. A--Taylor depo. 29-30; Exh. B--Palmer depo. 65-67).

15. When the Troopers finally obtained Plaintiff's information, they returned to their cruiser and began to check his background. It was discovered that on that date, February 26, 2014, Monsanto's driver's license was expired and had been for two (2) years. (Exh. D--Monsanto depo. 15-18, 58; Exh. A--Taylor depo. 30). The check also revealed that the year prior, Monsanto was stopped for a motor vehicle violation and during that stop he had been given a warning for having an expired license. The notes of the prior officer indicated how belligerent Monsanto was during that stop. At that point, Taylor made the decision to write up Plaintiff for the expired license. (Exh. A--Taylor depo. 30).

16. The background check also revealed that Monsanto had a felony assault conviction and had received a suspended sentence. (Exh. A--Taylor depo. 30).

17. The Troopers returned to the cruiser and Taylor printed out the tickets with a court date. (Exh. A--Taylor depo. 38; Exh. L—Summonses)

18. Giving a ticket for an expired license is an arrest. (Exh. B--Palmer depo. 80; Exh. A--Taylor depo. 31, 34). Troopers have discretion to make an arrest for an expired license. (Exh. B--Palmer depo. 72-73; Exh. G--O'Donnell depo. 100-101). When issuing a summons, the procedure is to perform the booking on scene and get a date for court. This includes taking a booking photo at the scene. This is to ensure that the officer has made a positive identification, and that the court officer can do the same on the day of court. (Exh. B--Palmer depo. 90; Exh. A--Taylor depo. 33).

19. As was standard procedure for issuing a summons for an expired license, Taylor requested that Monsanto get out of the vehicle so that he could take a picture and attach it to the case report so that the court officer could positively identify him. (Exh. A--Taylor depo. 32-33).

20. On February 26, 2014, the picture on Monsanto's license was old. At the time, Monsanto was thirty-one (31) years old. The picture on the license was from when Monsanto was in his early to mid-20's. In the photo Monsanto is not wearing a hat as he was on that February night. He does not remember if he had changed addresses from the one on the license. (Exh. D--Monsanto depo. 7, 127-128).

21. Initially, the intent of the troopers was to issue Monsanto a summons on scene and release him. He was not going to be put into handcuffs, rather, he was asked to exit the vehicle so that Trooper Taylor could obtain his booking information—such as current address, phone number, place of employment (Exh. A--Taylor depo. 34). All of this information would be used if Monsanto did not appear for court and a warrant was necessary. This was standard procedure,

and how Trooper Taylor performed every drivers' license arrest. (Exh. A--Taylor depo. 31-35; Exh. B--Palmer depo. 88, 95).

22. After the troopers walked back to Monsanto's vehicle, with the printed ticket in Trooper Taylor's possession, Taylor asked Monsanto to exit the vehicle and he refused, and instead reached over to get his cell phone. (Exh. D--Monsanto depo. 60-61; Exh. B--Palmer depo. 78; Exh. A--Taylor depo. 38). Taylor continued to ask Monsanto to get out of the vehicle. Monsanto continued to refuse, tensing his arms and jaw, clenching his fists and yelling that it was not an arrestable offense. Then he began yelling that the officers were racists. (Exh. B--Palmer depo. 78-81; Exh. A--Taylor depo. 27-30).

23. Taylor opened the door of the SUV and Monsanto eventually got out, yelling all the while that the officers were racists. (Palmer depo 78-83; Exh. F--Roadside Video). Monsanto would not allow Taylor to take his photograph, and at that point Taylor determined that Plaintiff should be charged with Obstruction. (Exh. A--Taylor depo. 38-39; Exh. B--Palmer depo. 88, 93). Monsanto referred to Taylor as "officer racist." (Exh. B--Palmer depo. 105; Exh. A--Taylor depo. 42; Exh. D--Monsanto depo. 67).

24. Monsanto admittedly tried to prevent his photo from being taken on the side of I-95 by leaning back. (Exh. D--Monsanto depo. 150).

25. Monsanto recorded a portion of the roadside stop on his cellphone, after the officers had taken information and been to the cruiser twice. When asked to exit the vehicle, Monsanto reached for the phone, told Taylor to "hold on" and then gave it to his passenger before he got out of the vehicle. (Exh. F--Roadside Video; Exh. D--Monsanto depo. 61, 69-70). The video does not capture the entire traffic stop.

26. Palmer does not recall having a discussion with Taylor about what to charge Plaintiff with. Trooper Palmer does recall Plaintiff being very loud, making inappropriate remarks, requiring the Troopers to remain on the side of I-95 for an expanded amount of time. Trooper Palmer described Monsanto as "very aggressive, inappropriate, loud" and expanded their time on the side of the highway outside of the vehicle. (Exh. B--Palmer depo. 76).

27. Other troopers heard Taylor's radio request for a tow. During that transmission, the trooper could hear a subject in the background who was yelling. Although the trooper could not make out what he was saying, it was aggressive and yelling, not just someone talking in a loud voice. (Exh. H--Affidavit of Buonaiuto and Exh. I--Statement of Rivello).

28. During the stop the troopers smelled alcohol coming from the passenger compartment of the car. (Complaint para. 25; Exh. B--Palmer depo. 85-86). Taylor recalls that Bates, the passenger, had alcohol on his breath and Taylor thought he was intoxicated. (Exh. A--Taylor depo. 36). Palmer recalls that the passenger's speech was slurred and that the vehicle smelled of alcohol. (Exh. B--Palmer depo. 85-87). Plaintiff's expert agrees that if this was the case, the vehicle should have been towed. (Exh. E--Rivera depo. 120). His passenger was given a ride home from another trooper. (Exh. D--Monsanto depo. 77-78). Other troopers arrived at the scene to have the vehicle towed. (Exh. I--Statement of Rivello)

29. Monsanto was transported to the Lincoln Woods Barracks in the rear seat of the cruiser. During the ride to the Barracks Monsanto began to threaten the officers, saying that if they didn't have badges, or if they weren't police officers, that he'd fuck them up. (Exh. B--Palmer depo. 96-97, 105, 107). Monsanto does not deny saying this, he just does not recall. (Exh. D--Monsanto depo. 82).

30. When Monsanto was brought into the barracks, he was taken to a booking room. There is a videotaped record of that process.[4] That video and audio indicates that the Plaintiff was resisting the Troopers, and referred to them as "Officer Racist" several times. (Exh. J—booking room video).

31. During the booking process Monsanto said, "You're so tough with that badge man, I swear…." but did not complete that thought. (Exh. J—booking room video). Palmer testified that throughout the process he continued to be loud, inappropriate and still would not allow them to obtain a proper photograph. (Exh. B--Palmer depo. 118; Video).

32. Plaintiff and the two Troopers left the booking room and went down the stairs to the cellblock. On the way down the stairs Plaintiff was in front, with Trooper Taylor directly behind him, and Trooper Palmer behind Taylor. Palmer never touched Plaintiff. (Exh. B--Palmer depo. 121).

33. As the senior trooper, Taylor did not discuss the charges that he was going to lodge against the Plaintiff with Trooper Palmer. (Exh. A--Taylor depo. 128).

34. Palmer did not prepare a written report about the incident. (Exh. B--Palmer depo. 83, 108).

35. Monsanto was ultimately charged with expired license, obstruction, simple assault, disorderly conduct, speeding, and no proof of insurance. (Exh. B--Palmer depo. 45).

36. All charges against Monsanto were dismissed on March 28, 2014 by members of the Rhode Island Department of Attorney General's Criminal Division. Former Colonel O'Donnell discussed the charges against Monsanto with Deputy Chief Attorney General Gerald Coyne.

---

[4] Previously, a transcript of the videotaped record was obtained, but is incomplete. The State Defendants have resubmitted the videotaped record to be transcribed in full and will supplement this motion with the transcript as soon as it is obtained.

(Exh. G--O'Donnell depo. 174). O'Donnell did not think the charge of simple assault would be sustained and there was concern about the video. (Exh. G--O'Donnell depo. 66).

37. Monsanto never sought any type of medical attention as a result of the incident on February 26, 2014. (Exh. D--Monsanto depo. 129).

38. Monsanto never filed any kind of citizen complaint with the State Police before initiating the instant lawsuit. (Exh. D--Monsanto depo.132).

39. After command staff and union representatives reviewed the videotape of the incident on February 26, 2014, two inquiries were launched: one internal affairs investigation by the Professional Standards Unit ("PSU") and the second by the Attorney General who presented the facts to a statewide grand jury.

40. As part of its Internal Affairs investigation, the PSU conducted several interviews. Transcripts of those interviews are kept in the normal course of business. (Exh. H--Affidavit of Capt. Buonauito). During this investigation, Trooper Taylor chose not to give a statement. (Exh. G--O'Donnell depo. 67-68).

41. After a staff member alerted Colonel O'Donnell to the cellblock video, he watched it and then brought the matter to the Attorney General's office for review. (Exh. G--O'Donnell depo. 138-141). The matter was presented to a statewide grand jury, and Taylor was indicted for one count of simple assault on Monsanto. During the pendency of the criminal indictment and case, the Internal Affairs investigation was halted. Plaintiff's expert notes that circumstances like this, where there is an administrative investigation and criminal investigation are "extraordinarily rare" and that the criminal matter trumps the Internal Affairs investigation. (Exh. E--Rivera depo. 209-210).

42. On June 16, 2014, Taylor, represented by counsel, entered a plea of *nolo contendere* to a single charge of simple assault on Lionel Monsanto. (Exh. K—Plea Transcript).

43. The Commission for Accreditation on Law Enforcement Agencies (CALEA) is the "gold standard" in police policies. (Exh. E--Rivera depo. 129).

44. CALEA is an independent accrediting authority created in 1979 by the four-major law enforcement executive associations: International Association of Chiefs of Police; National Organization of Black Law Enforcement Executives; National Sheriffs' Association; and Police Executive Research Forum. CALEA was established, in part, to develop a set of law enforcement standards and to establish and administer an accreditation process through which law enforcement agencies could demonstrate voluntarily that they meet professionally recognized criteria for excellence in management and service delivery.

45. The RISP is and has been accredited by the Commission of Accreditation for Law Enforcement Agencies ("CALEA") at all times relevant to the current lawsuit. The RISP achieved its initial accreditation from CALEA in 1994, and was reaccredited in 1999, 2002, 2005, 2008, 2011, 2014 and 2017. (Exh. C --Affidavit of Lt. Col. Barry p. 11) (Exh. G-- O'Donnell depo. 225-226).

46. CALEA is the only National Accreditation program for law enforcement. CALEA has national standards that accredited agencies and departments must implement and follow to receive CALEA Accreditation. (C--Affidavit of Lt. Col. Barry p. 12)

47. The RISP has been awarded as a CALEA Accredited with Excellence Agency. The assessments were based on using the Gold Standard Assessment Model. In 2014, the RISP was recognized as a Meritorious Agency for achieving and maintaining CALEA

Accreditation for fifteen (15) or more continuous years. (Exh. C--Affidavit of Lt. Col. Barry p. 13).

48. There are five general phases or steps in the accreditation process including Enrollment, Self-Assessment, On-Site Assessment, Commission Review and Decision, and Maintaining Compliance and Reaccreditation.

49. Following enrollment, agencies seeking initial accreditation muster enter a period of self-assessment where written directives, processes, and procedures are examined for compliance with CALEA national standards.  Agencies then develop proofs of compliance, which support actual application of standards into the everyday operation and administration of the agency.

50. After the completion of the self-assessment phase, a team of CALEA-trained Assessors visits the agency to determine compliance with standards, views agency operations, conducts a public information session, and reports its findings to the Commission for final determination of accreditation status.  CALEA Assessors must be able to evaluate the policies, procedures, practices and activities of the agencies.  (Exh. G--O'Donnell depo. 20-21)

51. A CALEA conference is held three times a year and that is with the Commission's Review Committees conduct public hearings regarding the agency's compliance to applicable standards.  If the Commission is satisfied that the agency has met all compliance requirements, the Commission awards accreditation for a three-year period. (Exh. G--O'Donnell depo. 21).

52. During the three-year accreditation award cycle, the agency must maintain compliance with applicable standards, keep its proofs of compliance current, and live by the letter and spirit of those standards.  To retain its accredited status CALEA requires proof of compliance with

their standards and reviews agency policies and training materials.  (Exh. E--Rivera depo.

130; Exh. G--O'Donnell depo. 20, 21).

53. The RISP was in compliance with all standards in their 2011 and 2014 CALEA assessments.

(Exh. E--Rivera depo. 133).

54. The RISP conducts training for newly-hired recruits at its academy located in Foster, Rhode

Island.  The academy training is twenty-two (22) weeks long and recruits reside at the facility

for the duration of their training. (Exh. C --Affidavit of Lt. Col. Barry p. 14).

55. The RISP Training Academy has five full-time sworn members including the Commandant,

Assistant Commandant and three (3) instructors.  The Training Academy has several guest

speakers, lecturers and other instructors including, but not limited to, trainers from the

Municipal Police Academy, Troopers qualified as firearms experts, a defensive tactics expert

and prosecutors from the Rhode Island Department of Attorney General. (Exh.  C--Affidavit

of Lt. Col. Barry p. 15).

56. In accordance with RISP General Order 26D, the Commandant works in conjunction with the

RISP Training Committee to develop a recruit training curriculum for each Training

Academy to ensure compliance with statutory and accreditation training requirements.  The

curriculum is strictly followed.  (Exh.  C--Affidavit of Lt. Col. Barry p. 16).

57. During the Training Academy, the recruits are trained on the following areas relevant to this

lawsuit:

   a. Criminal law and Rhode Island statutes
   b. Lawful use of force and the use of force continuum
   c. Motor vehicle laws
   d. Officer safety
   e. Rhode Island arrest laws
   f. Defensive Tactics
   g. Cultural diversity and Racial profiling

58. The RISP Training Academy also conducts annual and ongoing in-service trainings for sworn members. Additionally, the RISP consistently sends sworn members to specialized trainings nationwide. (Exh. C --Affidavit of Lt. Col. Barry p. 18).

59. After the Training Academy, sworn members continue to be trained in Use of Force and Cultural Diversity and Racial Profiling on an annual basis in accordance with CALEA standards. There are also mandatory ongoing and periodic trainings on various aspects of law enforcement, legal updates and applicable laws for all sworn members. (Exh. C-- Affidavit of Lt. Col. Kevin Barry p. 19).

60. The RISP trains its recruits and sworn members on all RISP General Orders (GOs) and Policies. The RISP policies are researched by the Accreditation Manager of the RISP to see if they are in compliance with CALEA national standards, and are presented to members of the RISP Command Staff and the Superintendent before being adopted. RISP sworn members must review all policies and sign their name through computer software called Power DMS. (Exh. C--Affidavit of Lt. Col. Barry p. 20).

61. The RISP trains its recruits and sworn members to only use force consistent with the RISP's use of force policy which is set forth in General Order 51A. (Exh. C--Affidavit of Lt. Col. Barry p. 23).

62. The RISP tracks and analyzes use of force incidents on an annual basis. This annual tracking is pursuant to RISP policies and procedure, which is compliant with CALEA national standards. The purpose of this tracking is to monitor and identify trends relating to uses of force within the RISP, and to determine whether additional training is necessary and whether any division rules, policies or procedures were violated. The annual analysis is conducted by

the OIC of Professional Standards who then forwards a copy of the analysis to the Superintendent for review.   (Exh. H--Affidavit of Capt. Bounaiuto p. 3).

63. All recruits and sworn members of the RISP are instructed that "[m]embers shall always act in accord with legally mandated authority, using discretion whenever appropriate" under RISP GO 1A, which is in compliance with CALEA standards.  (Exh. C--Affidavit of Lt. Col. Barry p. 21).

64. In accordance with RISP GO 56A2, entitled Traffic Enforcement, RISP recruits and sworn members are trained that "when stopping violators for any reason, a Division member's safety is of paramount importance.  Therefore, members shall take all precautions and steps necessary to assure their safety and well being during traffic stops."  Various factors are to be taken into consideration that "may dictate adjusting or altering the recommended procedures."  Additionally, with regards to Traffic Enforcement, RISP GO 56A1 states that "[t]he decision to take enforcement action rests with the individual sworn member." (Exh. C--Affidavit of Lt. Col. Barry p. 22).

65. The RISP also trains its recruits and sworn members regarding RISP's prohibition against Bias-Based Policing in accordance with CALEA national standards and this is set forth in GO 56A8. (Exh. C--Affidavit of Lt. Col. Barry p. 24).

66. The OIC of the PSU conducts an annual review of all citizen complaints relating to bias based policing to ensure the RISP's commitment to impartial policing in accordance with RISP GO 56A8 and in compliance with CALEA standards.  (Exh. H--Affidavit of Capt. Buonaiuto p. 4).

67. Plaintiffs expert found no fault with any of the training materials used by the RISP.  He testified that they were sufficient and appropriate.  (Exh. E--Rivera depo. 142)  He further testified that

none of the training he reviewed was constitutionally deficient or violated any clearly established law. (Exh. E--Rivera depo. 148-149). He had no criticism of the in-service training provided to the members of the RISP. (Rivera depo 150).

68. In accordance with RISP GO 28A, sworn members undergo an Annual Performance Appraisal. (Exh. C--Affidavit of Lt. Col. Barry p. 25).

69. Prior to February 26, 2014, neither Troopers Palmer nor Donnelly-Taylor received negative Performance Appraisals. (Exh. C--Affidavit of Lt. Col. Barry p. 26)

70. Prior to February 26, 2014, there were no citizen complaints submitted regarding Troopers Palmer. (Exh. H--Affidavit of Capt. Buonaiuto p. 6).

71. Plaintiff's expert agrees that there was no pattern of pretextual stops based on race for Trooper Palmer. (Exh. E--Rivera depo. 186).

72. Plaintiff's expert agrees that none of the training materials at issue were constitutionally deficient nor did they violate any clearly established law. (Exh. E--Rivera depo. 148-149). Additionally, Mr. Rivera found no fault with the in-service training and he testified that all RISP policies that he reviewed were sufficient. (Exh. E--Rivera depo. P. 150, 155).

Respectfully Submitted,

STATE OF RHODE ISLAND
By Its Attorneys,

PETER F. KILMARTIN
ATTORNEY GENERAL

*/s/ Rebecca Tedford Partington*

_____

Rebecca Tedford Partington , #3890
Chrisanne Wyrzykowski, #7565
Assistant Attorneys General
150 South Main Street
Providence, RI  02903
(401) 274-4400 ext. 2303/2235
(401) 222-2995 Fax
rpartington@riag.ri.gov
CWyrzykowski@riag.ri.gov

## CERTIFICATION

I, the undersigned, hereby certify that I filed the within via the ECF filing system and that a copy is available for viewing and downloading. I have also caused a copy to be sent via the ECF System to the following attorneys of record on this 9th day of July, 2018.

Robert J. Caron, Esq.
478A Broadway
Providence, RI 02909
rcaron@robertjcaronlaw.com

Kevin Braga, Esq.
The Law Offices of Kevin P. Braga
2095 Elmwood Avenue, Suite B
Warwick, RI 02888
kevin@kpbragalaw.com

John T. Martin, Esq.
KJC Law Firm LLC
10 Tremont Street, 6th Floor
Boston, MA 02108
mjc@olenn-penza.com

Michael B. Forte, Esq.
Olenn & Penza
530 Greenwich Avenue
Warwick, RI 02886
mbf@olenn-penza.com

*/s/ Rebecca Tedford Partington*

_____