UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

LIONEL MONSANTO

v.                                                             C.A. NO. 1:16-cv-00147

STATE OF RHODE ISLAND,
*by and through its* SECRETARY OF
TREASURY, SETH MAGAZINER;
JAMES DONNELLY TAYLOR, *Individually and
in his official capacity*; GREGORY PALMER,
*Individually and in his official capacity;* RHODE
ISLAND STATE POLICE;
COLONEL STEVEN G. O'DONNELL,
*Individually and in his official capacity*


v.

GOVERNOR GINA RAIMONDO, *in her
official capacity*; DIRECTOR OF
DEPARTMENT OF ADMINISTRATION
MICHAEL DIBIASE, *in his official capacity*;
ATTORNEY GENERAL PETER KILMARTIN,
*individually and in his official capacity*

### MEMORANDUM IN SUPPORT OF STATE DEFENDANTS'
### MOTION FOR SUMMARY JUDGMENT

## I. FACTS[1] AND BACKGROUND

The State of Rhode Island ("State"), Trooper Gregory Palmer ("Palmer"), former

Superintendent of the Department of Public Safety Steven O'Donnell ("O'Donnell") and the

Rhode Island State Police ("State Police" or "RISP"), (hereinafter collectively "State Defendants")

have moved this Court for summary judgment in their favor as to eleven of the thirteen causes of

action pled by Lionel Monsanto:  Counts II, III, IV, VI, VII, IX, X, XI, XII and XIII of Plaintiff's

---

[1] This summary of the salient facts has been gleaned from the "Statement of Undisputed Facts"
filed in support of the Motion for Summary Judgment.

Third Amended Complaint (hereinafter "Complaint").  The allegations levied against the State Defendants lack any legal basis and have not been supported by any facts unearthed in discovery. What has become clear is that there are few, if any factual disputes.  The question for the Court at this time is whether the facts alleged present legally cognizable claims.  Allowing these unsupported claims to go to the jury would only cause confusion and delay, and waste the resources of the parties, counsel, and the Court.  Therefore, the State Defendants respectfully request that summary judgment enter in their favor, as argued more fully below.

The material facts are not in dispute.  In the early morning hours of February 26, 2014 two Rhode Island State Troopers[2] observed Monsanto's vehicle on a service road parallel to I-95 in Pawtucket, Rhode Island.  They were conducting another traffic stop at a gas station, but because the speed of Monsanto's vehicle shook their cruiser, creating concern in the mind of Trooper Taylor of an impaired driver, the original stop was abandoned and the troopers returned to their cruiser and followed Monsanto.  The cruiser followed the Monsanto vehicle onto I-95, where both troopers observed the vehicle speeding.  After the cruiser's lights were activated, Monsanto pulled over to the side of the road.  Trooper Taylor approached the passenger window to obtain information about the driver and further investigate any motor vehicle violations.  Trooper Palmer remained at the drivers' side rear of the car, but could hear Monsanto being loud and aggressive, screaming, demanding to know why he was stopped.  It was only after getting out of the cruiser and approaching the Monsanto vehicle that Trooper Palmer became aware of the race of the two occupants.

---

[2] Defendant/Trooper James Donnelly Taylor was the senior trooper and driving the cruiser. Trooper Gregory Palmer was the passenger and less senior trooper.  (Palmer depo. 15, 41).

Taylor asked Monsanto more than once for his license and registration—each time being met with a loud demand as to why he was being "arrested."  Before Monsanto complied with the officer's lawful requests to roll down the window and then to exit the vehicle, Monsanto reached between the seats for a cell phone camera which he then gave to his passenger.  Prior to the cell phone being turned on, Monsanto had been yelling about the stop and calling the Troopers "racists."  When Monsanto finally gave Taylor his identification, the officers returned to the cruiser to check Monsanto's information against a law enforcement database—standard procedure.  They found that Monsanto's drivers' license had been expired for two years; that he had been stopped once before and given a warning for this infraction; that he had been belligerent and uncooperative during that stop; and that he had a prior felony assault conviction.  The officers were concerned that there might be a problem later, but Taylor simply printed out two summonses for Monsanto to appear at the Rhode Island Traffic Tribunal clearly signaling no intent to take him into custody at this point.  (Exh. L—Summons).

When the troopers returned to Monsanto's vehicle, Taylor asked him to get out so that he could take a photograph.  Monsanto did not think that was necessary.  As explained by Taylor and Palmer, contemporaneous photographs are taken so that the officer at the Traffic Tribunal would know, via the photograph on the paperwork, what the defendant looks like.  Monsanto was given back his license, which would not have been in the possession of the prosecuting officer when he went to the Traffic Tribunal.  Monsanto was thirty-one years old on February 26, 2014.  He was in his early 20's when his driver's license photo was taken.

While Taylor attempted to take Monsanto's photograph on the side of I-95 for use by the prosecuting officer, Monsanto's resistance increased.  With the summons that would have allowed Monsanto to drive off into the night still in his back pocket, Taylor made the decision to arrest

Monsanto for obstruction.[3]  Other troopers who heard the commotion on the radio came to the scene and gave Monsanto's passenger a ride home and the vehicle was towed.[4]

Both troopers testified that during the ride from Pawtucket to the Lincoln barracks, Monsanto repeatedly said things like "If you weren't in that uniform, I'd fuck you up."[5]   When the troopers brought Monsanto to the Lincoln barracks, his unruly behavior continued.  He was brought into the booking room, where a video was taken of the approximately twenty-minute information gathering process.

After the troopers were finally able to obtain the necessary booking information, they began the process of taking Monsanto downstairs to the cell block.  Both troopers testified that Monsanto resisted that process as well, by tensing up his body and refusing to walk.  Monsanto was guided by Taylor, who was followed by Palmer.  When they went around two corners and got to the cellblock, that video captures what happened next.  Palmer did not touch Lionel Monsanto during the few seconds Taylor was in the cell.

At the end of the day, Monsanto was charged with speeding, operating a motor vehicle without evidence of insurance, operating with an expired license, disorderly conduct, obstruction

---

[3] R.I. Gen. Laws 11-32-1 makes it a misdemeanor to "obstruct any officer…while in the execution of his or her office or duty…."

[4] Plaintiff's expert Richard Rivera believes that the towing of the vehicle is indicative of something nefarious.  (Rivera depo. 140).  The uncontradicted testimony was that both troopers detected the odor of alcohol in the passenger compartment, and that the passenger's words were slurred.  (Palmer 85-86; Taylor 36).  Rivera admits that if the passenger was suspected of being under the influence, towing the Monsanto vehicle was proper.  (Rivera depo. 120).  They certainly could not have allowed an individual suspected of being under the influence drive off into the night.

[5] This behavior alone would sustain a charge of disorderly conduct under Rhode Island law.  In State v. Matthews, 111 A.3d 390 (R.I. 2015) a defendant challenged his conviction of disorderly conduct, arguing that his threats to police were just abusive.  The Rhode Island Supreme Court disagreed, sustaining the conviction, noting that Matthews had refused to provide his ID to troopers and that he immediately escalated what could have been a routine inquiry into a threatening situation.

of justice, and simple assault.  Those charges were eventually dismissed.  After command staff and union representatives, including the Colonel, reviewed the videotape of the incident, two inquiries launched into the conduct of Trooper Taylor: one internal affairs investigation, where statements were taken from numerous troopers.  The matter was referred to the Attorney General, and was ultimately was presented to a grand jury.  The IA investigation gave way, as it should have, to criminal prosecution.  After a statewide grand jury considered the case, Taylor was indicted for simple assault on Lionel Monsanto.  In state court, Taylor was represented by counsel and, on June 23, 2014 pled *nolo contendere* to that charge.

## II. ALLEGATIONS AGAINST THE STATE DEFENDANTS AND SUMMARY OF ARGUMENT

- **Count I** is a 42 U.S.C. 1983 claim levied against Taylor and does not allege a cause of action against any State Defendant.

- **Count II** alleges a "failure to train" and supervise against the State of Rhode Island only. It appears that this Count is based on a state law negligence theory. State law is clear that excessive force claims cannot be the basis for liability against a law enforcement agency. As Plaintiff's expert does not dispute the adequacy of any policy, the training materials or the quality of in-service training, and since he has not attended the Academy and has no particular deficiency to note in the instruction given there, and since no causal link has been shown, there is no material fact to present to a jury.  If the Court wishes to read Count II as based on 42 U.S.C. 1983, Plaintiff's remedies are limited to injunctive relief.

- **Count III** alleges a conspiracy that violated 42 U.S.C. 1983 (not section 1985).  Taylor testified that it was his decision alone as to the charges brought against Monsanto. The only evidence provided during discovery is that the conversation the troopers had during the roadside stop concerned what to do if Monsanto became unruly.  Plaintiff has not specified

what federally protected right was violated by this conversation, and thus summary judgment is proper;

- **Count IV** alleges supervisory liability under 42 U.S.C. 1983 against former Colonel O'Donnell.  All of the allegations of impropriety against Colonel O'Donnell stem from his actions *after* the events of February 26, 2014, and surround the Internal Affairs investigation and the criminal proceedings against Taylor.  There is no hint of a causal link to Monsanto's alleged injuries, nor can there be.  Even Plaintiff's expert could offer nothing more than conjecture and speculation, creating no material issue of fact for the jury's consideration;

- **Count V** alleges state law claims of assault and battery against Trooper Taylor only and will not be addressed herein;

- **Count VI** alleges a state law claim of malicious prosecution against both troopers.  This claim cannot survive summary judgment as to Palmer, as he did not have a role in determining what charges to bring; since the charges brought were supported by probable cause, and since neither trooper had a role in deciding to dismiss the charges against Monsanto;

- **Count VII** alleges state law claims of false imprisonment and false arrest against both troopers.  Because the initial stop was supported by reasonable suspicion, and the arrest supported by probable cause, these claims cannot survive summary judgment;

- **Count VIII** alleges the state tort of intentional infliction of emotional distress against Trooper Taylor only and is not addressed herein;

- **Counts IX and X** allege a statutory violation of the prohibition on racial profiling contained in R.I. Gen. Laws 9-1-35 and 31.21.2-3.  As the exclusive jurisdiction for a

6

violation of either of these sections lies with Rhode Island's Superior Court, this court lacks jurisdiction and, further, the Eleventh Amendment to the Constitution of the United States bars this Court's consideration. Finally, there is absolutely no evidence from which a jury could find liability for any intentional acts on the part of Trooper Palmer under either section.

- **Count XI** alleges a federal cause of action for racial profiling, a state law doctrine that simply cannot be maintained in this Court and which should fail for the same reasons Counts IX and X do;

- **Counts XII and XIII** allege respondeat superior liability, which is not a stand-alone cause of action.

In considering the arguments set out below, it is helpful to note that all of the claims levied against Palmer are based in the time period *before* the incident in the cellblock, and all of the claims levied against Colonel O'Donnell in the time *after* the events of February 26, 2014.

## III.  STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Morrissey v. Boston Five Cents Sav. Bank, F.S.B., 54 F.3d 27, 31 (1st Cir. 1995). In response, the Plaintiff "may not rest upon the mere allegations or denials of [his] pleadings, but…must set forth the specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "A fact is 'material' if it potentially could affect the suit's outcome. An issue concerning such a fact is 'genuine' if a reasonable fact finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting

summary judgment, could resolve the dispute in that party's favor."   Cortes-Iriszarry v. Corporacion Insular DeSeguros, 111 F.3d 184, 187 (1st Cir. 1997)(citations omitted).

Accordingly, the purpose of summary judgment is to permit the court "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required" on the claims being examined.   Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 793-94 (1st Cir. 1992) cert. denied 113 S. Ct. 1845 (1993).   The nonmoving party is not at liberty to rebut with general denials.   Rule 56(c) requires entry of summary judgment "upon motion against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial."   Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

"[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment."   Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).   Motions for summary judgment must be decided on the record as it stands, not on litigants' visions of what the facts might some day reveal.   As the First Circuit has warned, "[b]rash conjecture, coupled with earnest hope that something concrete will eventually materialize, is insufficient to block summary judgment."   Dow v. United Bd. of Carpenters, 1 F.3d 56, 58 (1st Cir. 1993).

## IV.   ARGUMENT

### A.   Trooper Gregory Palmer Did Not Violate Any "Clearly Established" Constitutional Right of Lionel Monsanto, And Is Therefore Entitled To Summary Judgment Based On Qualified Immunity.

Gregory Palmer was the junior trooper paired with James Donnelly Taylor on the night shift of February 23-24, 2014.   He was not driving the cruiser.   (Palmer depo. 15, 41).   As he and Trooper Taylor were in the early stages of a traffic stop at a gas station in Pawtucket, a vehicle went by at such a rate of speed as to shake their cruiser.   Taylor stated something to the effect of

"Hey, look at that guy" and directed Palmer to get into the cruiser.  As the troopers caught up with Monsanto's vehicle, Palmer and Taylor both noticed that he was speeding.  After Taylor activated the lights and siren, pulling Monsanto over, Palmer took a position at the rear of Monsanto's vehicle near the lane of travel.  Palmer testified that the first time he noticed that the occupants of the vehicle were African American was after the stop, when he approached the window.[6]  Taylor did not talk to Palmer about what charges were to be brought against Monsanto. (Taylor depo. 128-129).   Palmer did not touch Monsanto at any time during the night.

The only federal claims against Palmer are specific, focus on the time period before Monsanto's arrival at the Lincoln Woods barracks, and are found in Counts III and XI.  In Count III, Monsanto charges that Palmer engaged in a conspiracy under section 1983 with Taylor to have Monsanto falsely arrested, seized, jailed, deprived of liberty and prosecuted; that Palmer agreed to intentionally fabricate and contrive the charges lodged against Monsanto; and that Palmer agreed to intentionally submit false police reports, statements and testimony to support and corroborate the fabricated charges lodged against him.  (Complaint para. 49).  In Count XI Monsanto alleges racial profiling in violation of 42 U.S.C. 1983. Monsanto also alleges state claims of malicious prosecution, false imprisonment/false arrest and racial profiling against Palmer.  None of the claims against Palmer can survive a qualified immunity analysis (federal or state) or a summary judgment inquiry.

---

[6] Monsanto would have this Court believe that the officers could identify him as African American based on the reverse logic that since he could see they were white, they knew he was black.  This is not enough to avoid summary judgment on any count.  Monsanto consistently attempts to remove discretion from the toolbelt of law enforcement officials.  Even his own "expert" testified that there are variables when determining the race of a driver.  (Rivera depo. 172).  The uncontradicted testimony from Palmer is that he did not know the race of the driver until after the vehicle was pulled over on the side of I-95.  (Palmer depo. 41, 60, 61).

Monsanto has not articulated a clearly established right he claims Palmer violated.  We are forced to guess.  Palmer did not submit a police report, did not decide what charges would be lodged against Monsanto, and did not touch Monsanto.  On the side of the road, his job was to be aware of the scene and oncoming traffic—ensuring safety and security.  The mere fact that he was present is not enough to impose liability under any theory.

The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  Pearson v. Callahan, 555 U.S. 223, 231 (2009).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.  The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."  Id. at 231.

The determination whether an official is entitled to qualified immunity requires an assessment as to whether the facts alleged or shown by the plaintiff "make out a violation of a constitutional right" and, if so, "whether the right at issue was clearly established at the time of defendant's alleged misconduct.  Id. at 232.  "[T]he second, 'clearly established,' step of the qualified immunity analysis…in turn has two aspects."  Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009).  As the First Circuit has taught:

> One aspect of the analysis focuses on the clarity of the law at the time of the alleged civil rights violation.  To overcome qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  The other aspect focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights.  Indeed it is important to emphasize that this inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.

Id. (citations omitted).  Thus, "the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Id. (citations omitted).

Monsanto claims that Palmer's involvement in his arrest, charges and prosecution violated the constitution.  All of the charges against Palmer rest on the initial stop and its reasonableness under the Fourth Amendment, which provides a very low threshold—reasonable suspicion.[7] Monsanto doggedly refuses to acknowledge that law enforcement officers policing the streets— and certainly the busy I-95 corridor—have discretion in performing their duties.  This position defies logic and the law.  *See, e.g.,* Town of Castle Rock v. Gonzalez, 545 U.S. 748 (2005) (discussing the "well established tradition of police discretion" even in the face of mandatory arrest statutes, citing Chicago v. Morales, 527 U.S. 41, 47 (1999)).  There is no constitutional right to be free from a traffic stop or an arrest.  To the contrary, pursuant to R.I. Gen. Laws § 12-7-10, it is unlawful for any person to use force to resist even an illegal arrest.  Asking a motorist to roll down a window to facilitate an officer's inquiry is clearly lawful.  *See* United States v. Perez, 1991 WL 109245, at *1 (C.A.9 (Cal. 1991).  The First Circuit acknowledges that facts gleaned after a traffic stop may create heightened suspicions for an officer such that he can (and should) shift his inquiry from the traffic stop to investigating other potential criminal activity.  Estrada v. Rhode Island, 594 F.3d 56, 64 (1st Cir. 2010).  A seizure for a traffic violation justifies a police investigation.

---

[7] A stop is justified at its inception if the officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." United States v. Kimball, 25 F.3d 1, 6 (1st Cir. 1994) (citing Terry v. Ohio, 392 U.S. 1, 21 (1968)).  Here, Taylor observed that in the early morning hours of February 26, 2014, Monsanto's vehicle passed them at the gas station with such speed that it made the cruiser shake.  After following the vehicle on to I-95 both troopers observed Monsanto's vehicle exceeding the speed limit.  The officers therefore had reasonable suspicion to support a traffic stop.

"[A] relatively brief encounter," a routine traffic stop is "more analogous to a so-called '*Terry* stop' …than to a formal arrest." Rodriguez v. United States, ___ U.S. ___, 135 S.Ct. 1609, 1614 (2015).   "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' Typically, such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.   These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." Id. (citations omitted).   Thus, according to the United States Supreme Court, the Troopers had every right to stop Monsanto and then gather preliminary data.   When that data showed that his license had been expired for two years, that he had been stopped and released before,  and there was no proof of insurance on the vehicle, they had a right to give him a summons and citation to appear at Rhode Island Traffic Tribunal, his beliefs to the contrary.

Certainly, the fact that both officers believed that the vehicle was speeding and Taylor's concern that the driver may be impaired provided the officers with reasonable suspicion to pull the vehicle over.   Monsanto's formal arrest came later, after the troopers learned that his license had been expired for two years and after he obstructed their attempts to obtain information from him so that he could be released.   Monsanto's expert witness agreed that it is permissible in the State of Rhode Island to arrest for an expired license, contradicting the Plaintiff's belief.   (Contrast Rivera depo. 118 with Monsanto's statements at the scene).   The probable cause for arrest was established upon a determination that the license was expired, that there was no proof of insurance, and later when Monsanto obstructed Taylor in the performance of his duties.[8]

---

[8] It is well established that probable cause exists when "police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe [that a] suspect committed or was committing a crime." United States v.

Rivera admitted that nothing he has seen demonstrates a pattern of pretextual stops on Palmer's part.  (Rivera depo. 186).  Monsanto claims that the officers should have immediately told him why he was being stopped.  Once again, Monsanto is attempting to substitute his beliefs for the discretion that must be afforded law enforcement officers.  There is no "clearly established" right to be told immediately on a motor vehicle stop why you have been stopped. (Rivera 144).  Nothing during this time period shows that Palmer violated some "clearly established" constitutional right of Lionel Monsanto.

State law also recognizes that qualified immunity, when pled in the appropriate case, would act as a complete bar to a tort claim against a governmental official exercising discretion.  *See, e.g.*, Ensey v. Culhane, 727 A.2d 687, 690 (R.I. 1999)(recognizing that in the appropriate case as to the appropriate individual tortfeasor, qualified immunity could act as a complete bar and should be determined at the summary judgment stage); Fabrizio v. City of Providence, 104 A.3d 1289, 1293 (R.I. 2014)(noting the existence of a qualified immunity defense to a state court claim, but that such a defense is considered only if a constitutional violation is established).

In Palmer's case it is simple—none of his actions violated any law, let alone clearly established law.  There are two claims against Palmer, both aimed at the initial stop and subsequent charges.  Reasonable suspicion supported the initial roadside stop based on the observation of the speeding vehicle at the gas station and the later observed speed on I-95.  Palmer then stood at the rear of Monsanto's vehicle, having no contact with either Monsanto or his passenger.  When he returned to the cruiser, he, along with Taylor, learned that Monsanto's driver's license had expired

---

McFarlane, 491 F.3d 53, 56 (1st Cir. 2007) (quoting United States v. Burhoe, 409 F.3d 5, 10 (1st Cir. 2005).  This inquiry focuses on "what the officer knew at the time of the arrest, and should evaluate the totality of the circumstances." Id. (citing United States v. Jones, 432 F.3d 34, 41 (1st Cir. 2005)).

two years prior, and that he had been stopped for this infraction before.  They also learned that Monsanto had a criminal record of felony assault.  The data available to the troopers in their cruiser noted that the officer who warned Monsanto of his expired license two years prior noted how belligerent Monsanto was. (Taylor depo. 30).

The initial decision by Taylor was to give Monsanto a citation and a summons and release him.  The troopers did not discuss the charges to be brought, but may have briefly talked about whether Monsanto might become resistant, which he did.  There is no clearly established right to non-communicative arresting officers.  Officers should engage in discussion about whether conduct violates the law, and whether they should be on heightened alert for physical danger from an arrestee.

The thought process changed after Taylor was unable to obtain a photograph of Monsanto.  Again, Palmer was not involved in this process.  There was no clearly established law to have charges immediately communicated to a driver, preventing troopers from discussing charges to be brought, or what to do if a clearly combative suspect were to turn violent.  Monsanto has not been clear as to what "clearly established right" was violated by Palmer.  As there are no other charges levied against Palmer, the case against him is ripe for summary judgment.

**B.     Colonel O'Donnell Did Not Violate Any "Clearly Established" Right Of Lionel Monsanto, And Is Therefore Entitled To Summary Judgment.**

Discovery revealed that the case against Colonel O'Donnell is based on the irrelevant and inaccurate theory that he "interfered" in the IA investigation by viewing the cellblock video and— although the exact nature of the conversation is disputed—that he discussed the criminal charges against Taylor with him and his representatives.  Rivera also believes that the discipline meted out to Taylor (in addition to the criminal sentence) showed "deliberate indifference" on the part of Colonel O'Donnell. (Rivera depo. 193-199).  The State submits that, as a matter of law, nothing

14

that happened after February 26, 2014 is material to Monsanto's case, and cannot be used as a springboard for supervisory liability.

O'Donnell is entitled to qualified immunity from the failure to train and supervise claim for all the same reasons and pursuant to the same legal standards that justify the granting of qualified immunity for Palmer. More precisely, it was not clearly established that a top law enforcement official would exhibit "deliberate indifference" to Monsanto's rights by watching the cellblock video,  by taking a potential assault case to the Attorney General's office for review by a Grand Jury, and then disciplining officer Taylor after the criminal matter was over.

### C.    Summary Judgment is Appropriate as to Count II, Monsanto's Failure to Train/Supervise Claim Against The State

Count II of Plaintiff's Third Amended Complaint asserts that the RISP's "omissions, policies and customs of the State of Rhode Island" were the direct and proximate cause of Plaintiff's injuries and that the RISP "grossly failed to train its state troopers in the fundamental law of arrest, seizure, prosecution and racial profiling."  (Complaint, para. 44, 46, 47).

First, there is no hint in this Count that it is premised on federal law. Does Monsanto allege a federal constitutional violation?  Or mere negligence?  If this is a federal claim, then the only relief that can be sought or granted against the State is injunctive relief, as a State is not a "person" for purposes of 42 U.S.C. 1983 monetary liability.  Will v. Michigan, 491 U.S. 58 (1989).  Rivera's testimony sheds no light, as he offers only conclusory statements based on the wrong legal standards.  If Count II alleges a state law claim of negligence, then this Court should decline to exercise jurisdiction, or, in the alternative, should grant summary judgment pursuant to applicable state law.  In Cruz v. Town of North Providence, 833 A.2d 1237 (R.I. 2003), the Rhode Island Supreme Court examined whether a municipality could be held liable under respondeat superior liability where one of its officers assaulted a motorist.  The Court explained that "[a]n employer,

such as a municipality, can be held liable for an employee's intentional tort committed against a third party <u>only if the misconduct falls within the scope of employment</u>."  <u>Id.</u> at 1240 (emphasis added).  Applying this rule of law to a situation where a law enforcement officer committed an assault and battery, the Court held that [a]cts of police brutality, however, whether committed by one or more police officers, do not generally fall within the scope of their employment."  <u>Id.</u> at 1240 (citing <u>Bryant v. Mullins</u>, 347 F.Supp. 1282, 1284 (W.D. Va. 1972)("[T]he use of excessive force by a police officer is not within the scope of his duty or employment."  As such, the Supreme Court determined that the Town could not be held liable for an officer's assault and battery, as those crimes cannot be committed within the scope of one's employment as a law enforcement officer.  *See also,* <u>Aldrich v. Tripp</u>, 11 R.I. 141 (1875)(city appointing police officer not liable for officer's assault and battery).

This Court does not consider this matter in a vacuum.  Recently the Rhode Island Supreme Court had the opportunity to determine whether Trooper Taylor was acting within the scope of his employment when he assaulted Monsanto.  After reviewing relevant statutory and contractual language, and controlling case law, the Supreme Court determined that the information before the Attorney General (the same information as that before the court herein) supports the decision that Trooper Taylor's conduct fell outside the scope of his employment as a Rhode Island State Trooper and that a jury could conclude that he acted willfully.  <u>State of Rhode Island v.  Rhode Island Troopers Assoc.</u>, 2018 WL 3131462, No. 2017-330-Appeal (R.I. June 27, 2018).

Most importantly for the purposes of the instant motion, Rivera gave the opinion that none of the training material used by the State Police is constitutionally deficient.[9]  (Rivera depo. 148).

---

[9] The State Police provided thousands of pieces of information regarding training given to potential troopers, including lesson plans, and powerpoints used to train both recruits and sworn members.  Rivera could find no fault with any of it.  (Rivera depo. 148).

Nor did any of that material violate clearly established law. (Rivera depo. 149).   Rivera had no criticism of the in-service training given to troopers.  (Rivera depo. 150).  He found no policy of the Rhode Island State Police to be deficient.  (Rivera depo. 155).

No discovery was done as to the actual instruction at the Academy, and the affidavit of Lt. Col. Kevin M. Barry establishes unequivocally that training was done in accordance with the materials.  There is no evidence that the training given to the troopers deviated from the material that met with Rivera's approval.  Where, then is the liability?

A state law claim for negligence cannot survive summary judgment as a matter of law, since Monsanto has not established a duty that was breached, causing his injury.  First, the State cannot be held responsible in tort unless a plaintiff demonstrates a special duty running to him, and not just to the general public.  Law enforcement is viewed as a governmental function, that is, a function that a private person would not normally perform.  As such, the State is insulated from liability pursuant to the public duty doctrine.  The Court need look no further than <u>Barratt v.</u> <u>Burlingham</u>, 492 A.2d 1219 (R.I. 1985) to determine that a negligence action will not lie in the instant case.  In holding that the State was immune following a deadly accident where an officer had allowed an intoxicated motorist to continue driving and plow into the decedent's vehicle, the Rhode Island Supreme Court taught:

> Recognizing that certain government activities engaged in by employees and officers must be free of the threat of potential litigation, this court concluded that before such liability could be imposed upon the state, 'plaintiffs must show a breach of some duty owed them in their individual capacities and not merely a breach of some obligation owed the general public.

<u>Id</u>. at 1221.

In <u>O'Brien v. State,</u> 555 A.2d 334, 336–37 (R.I. 1989), this Court shed further light on the public-duty doctrine:

> [It] does not resurrect the concept of sovereign immunity but it does take into account the unquestionable fact that many activities performed by government could not and would not in the ordinary course of events be performed by a private person at all. Among such activities would be those that we have considered in our cases, such as licensing of drivers, management and parole of incarcerated prisoners, and the exercise of the police power through officers authorized and empowered by the state to perform a police function. <u>We believe that the exercise of these functions cannot reasonably be compared with functions that are or may be exercised by a private person.</u>  (emphasis added).

Therefore, in training recruits for their law enforcement careers, the State is performing the quintessential law enforcement function, and the public duty doctrine shields it from liability.

If the Court wishes to delve further, it must recognize that Plaintiff has failed to present a triable issue as to the State's liability on failure to train grounds, as the RISP is a CALEA accredited department.  CALEA is the only national accreditation agency for law enforcement (Exh. C–Barry Affidavit), with a lengthy and intricate accreditation process. (Rivera depo. 129)("CALEA is the gold standard in policies and best practices").  The detailed and extensive instruction of all recruits (pursuant to materials that have Rivera's stamp of approval) during the Training Academy at its on-site Training Center as well as the annual, regularly-scheduled and ongoing training provided by the RISP to all of its sworn members is undisputed.  (Rivera depo. 142, 148, 149).  The undisputed facts support a finding that the RISP's policies, practices and customs as to training were in full compliance with the CALEA standards as an accredited department, and based on that, summary judgment should enter.

**D.  Plaintiff Has Failed To Offer Anything But Conclusory Allegations to Support His Claims of Conspiracy Under 42 U.S.C. 1983 Against Palmer (Count III), Thus, Summary Judgment is Appropriate**

An actionable civil rights conspiracy under Section 1983 is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages." Diaz-Moralez v. Rubio-Paredes, 170 F.Supp.3d 276, 289 (1st Cir. 2016) (citation omitted). In granting summary judgment as to similar claims of conspiracy, the First Circuit instructed that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." Id. Continuing, the Court advised that it would "not do counsel's work. '[S]ummary judgment may…be appropriate on a conspiracy claim where the nonmoving party rests merely on conclusory allegations." Id. (citation omitted).   Allegations of conspiracy must be supported by material facts, not merely conclusory statements. Slotnick v. Staviskey, 560 F.2d 31, 33 (1st Cir. 1977), cert. denied, 434 U.S. 1077 (1978); Mendez v. Belton, 739 F.2d 15, 19 (1st Cir. 1984).  In Mercurio v. Town of Sherborn, 287 F.Supp. 3d 109 (D.Mass. 2017), the court granted summary judgment based on the conclusory nature of the conspiracy allegations against defendant officers.  In holding that those claims of conspiracy could not survive summary judgment, that court quoted from Martin v. Unknown U.S. Marshals, 965 F.Supp.2d 502, 547 (D.N.J. 2013), which held that it "is not enough…that the end result of the parties' independent conduct caused plaintiff harm or even that the alleged perpetrators of the harm acted in conscious parallelism…[r]ather the plaintiff bears the burden of showing that the alleged conspirators reached an understanding, or had a meeting of the minds to violate his rights."

Count III is limited to Monsanto's arrest and detention, charging and police reports, and does not allege a conspiracy as to the alleged excessive force.  Monsanto has not elaborated on what "civil rights" the troopers conspired to violate.[10]  Discovery added no flesh to the bones of the Complaint—Monsanto merely recounts what happened to him on the night of February 26, 2014 and then makes the unsupported assumption that it happened because of his race.  He has failed to offer "any discussion, offer to assist, request for assistance, or other indication of agreement" between the troopers.  *See* <u>DeMeo v. Kean</u>, 754 F.Supp.2d 435, 446 (N.D.N.Y. 2010)(granting summary judgment as to conspiracy claims).

At this critical juncture, Monsanto has failed to offer any material facts that would allow a conspiracy claim to go to a jury.  Monsanto testified at his deposition that the conspiracy was to arrest and prosecute him,[11] and that the conspiracy began at the moment of pursuit.  He does not know what the officers were talking about in their car as they began their pursuit.  Taylor testified at his deposition that he did not talk to Palmer about the charges he was going to file against Monsanto—he testified that it was his decision alone as the senior trooper.  (Taylor depo. 128-129).  Clearly, then, there was no agreement or common plan to violate any of Monsanto's civil rights, and the claims of conspiracy must be disposed of at this juncture, as they are legally and factually unsupported.

---

[10]  Frankly, the sparse allegations in the Complaint are not sufficient to withstand even a Motion to Dismiss.  "In an effort to control frivolous conspiracy suits under §1983, federal courts have come to insist that the complaint state with specificity the facts that, in the plaintiff's mind, show the existence and scope of the alleged conspiracy.  It has long been the law in this and other circuits that complaints cannot survive a motion to dismiss if they contain conclusory allegations of conspiracy but do not support their claims with references to material facts. …the courts need not conjure up unpleaded facts to support these conclusory suggestions."  <u>Slotnick</u>, 560 F.2d at 33 (internal citations omitted).

[11]  As the Attorney General is the prosecuting authority, the only claim against Palmer would be conspiracy to arrest.  This is not borne out by the undisputed facts.

**E.  Monsanto Cannot Sustain Count IV Alleging Supervisory Liability As To Steven O'Donnell In Law Or Fact And Summary Judgment Should Enter.**

In the conclusory fashion that permeates his pleadings, Monsanto claims that Colonel Steven O'Donnell knew that the conduct of "the officers" was likely to occur, and that his failure to take any action amounted to deliberate indifference.  (Complaint para. 52).  Monsanto also alleges that O'Donnell "participated" in his prosecution and then did not fire Trooper Taylor.[12] These are exactly the sort of "unadorned, the-defendant-unlawfully-harmed-me accusation[s] that the First Circuit and the Supreme Court have found insufficient.  Feliciano-Hernandez v. Pereira-Castillo, 663 F.3d 527, 534 (1st Cir. 2011), quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  The reason courts are loathe to impose supervisory liability in constitutional cases is that such individuals rarely have any direct involvement in a case, and exposing them to money judgments would violate the spirit of the civil rights laws, and no doubt inhibit qualified candidates from such positions.  The scope of responsibility of the Superintendent of the Department of Public Safety is enormous.  (Exh. C –Barry Affidavit).  In order to impose liability on the supervisor of such an organization, then, it must be shown that the individual actually participated in the wrongdoing of the subordinate.   The First Circuit has repeatedly held that "broad allegations against high-ranking government officials fail to state a claim."  Feliciano-Hernandez, 663 F.3d at 532 and cases cited therein.   A "strong causal connection" is required.  See, Ramirez-Lluveras v. Rivera-Merced, 759 F.3d 10, 19 (1st Cir. 2014)(stating that supervisory liability is not allowed under section 1983, that negligence is not enough, and that liability cannot rest solely on a defendant's position of authority).

---

[12] It is telling that both sides of this case complain about O'Donnell's actions relative to Trooper Taylor post-February 2014.  Monsanto claims that O'Donnell did not do enough in disciplining Taylor, and, in his Third-Party Complaint, Taylor claims that O'Donnell went too far.

To begin, it is settled that the doctrine of respondeat superior does not apply to section 1983 claims.  Lopera v. Town of Coventry, 652 F.Supp. 2d 203 (D.R.I. 2009), *aff'd.,* Lopera v. Town of Coventry, 640 F.3d 388 (1st Cir. 2011); Camilo-Robles v. Zapata, 175 F.3d 41, 43 (1st Cir. 1999).  Instead, public officials can only be liable for their own acts or omissions.  Grajales v. P.R. Ports Auth., 682 F.3d 40, 47 (1st Cir. 2012); Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 502 (1st Cir. 2011); Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 562 (1st Cir. 1989).  Within the specific contours of a section 1983 supervisory liability claim, that principle means that a supervisor may only be subject to liability in instances in which the supervisor is a "direct participant" in the unconstitutional conduct, otherwise known as a "primary violator[,]" or if the supervisor engaged in oversight conduct of the subordinate that can be categorized as the condonation or tacit authorization of the subordinate's behavior.  Whitfield v. Melendez-Rivera, 431 F.3d 1,14 (1st Cir. 2005); Camilo-Robles, 175 F.3d at 44; Hegarty v. Somerset Cnty., 53 F.3d 1367, 1379-80 (1st Cir. 1995).

As in Lopera, Plaintiff's case rests on an "inevitable likelihood" argument.  Like Lopera, "[t]his argument asks too much."  652 F.Supp. 2d. at 219.  Judge Smith's finding that the Lopera plaintiffs "have presented no evidence of 'a known history of widespread abuse sufficient to alert a supervisor to ongoing violations" Id. (citation omitted) applies to bar claims asserted in Count IV against O'Donnell.  As in Lopera, this case fails to present "a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." Id. (citation omitted).  As in Lopera, "the evidence submitted is inadequate to conclude [Colonel O'Donnell] was deliberately indifferent or willfully blind."  Id. (citation omitted).

Monsanto can only succeed on his failure to train claim under section 1983 if that failure is the cause or the "moving force" behind the underlying constitutional deprivation.  City of

<u>Canton</u>, 489 U.S. at 388. The Supreme Court has employed an "actual causation" standard in claims against a government for the negligent training and supervision of government officials under 42 U.S.C. § 1983. <u>City of Canton</u>, 489 U.S. at 390. That is, to maintain a section 1983 claim based on training, a plaintiff must demonstrate that the claimed deficiency "actually causes injury." <u>Id.</u> at 390.  The Supreme Court has described this burden as requiring a showing that "the identified deficiency in a city's training program . . . [is] closely related to the ultimate injury. . . Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" <u>Id</u>. at 391.

The determination of whether there is a causal link has been characterized as a legal conclusion rather than a function of objective fact. <u>Britton v. Maloney</u>, 901 F.Supp. 444 (D. Mass 1995). The Supreme Court has instructed that in order to determine if a plaintiff has met this "rigorous standard" of causation, the Court should refer to state tort principles. <u>Rodriguez-Cirilo v. Garcia,</u> 115 F.3d 50 (1st Cir. 1997); <u>Soto v. Carrasquillo</u>, 878 F.Supp. 324, 331 (D. Puerto Rico 1995). Under Rhode Island's causation standard, Monsanto must demonstrate that "but for" the alleged failure to act, the injury would not have occurred. <u>Geloso v. Kenny</u>, 812 A.2d 814, 818 (R.I. 2002). In this case, given the admission by Taylor that his actions crossed the line into criminality, coupled with the testimony by Richard Rivera that the training materials, policies and in-service training were all adequate, then, as a matter of law, summary judgment should enter in favor of the State.

Monsanto makes no allegation that O'Donnell participated personally and directly in the alleged rights-violating conduct of the troopers on February 26, 3014.  In order to sustain that form of supervisory claim, Monsanto is tasked with demonstrating that (1) the subordinate's behavior resulted in a constitutional violation; and, (2) "the supervisor's action or inaction was affirmatively

linked to that behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference. Pineda v. Toomey, 533 F.3d 50, 53 (1st Cir. 2008).  That case went on:

> The requirement of an 'affirmative link' between the behavior of a subordinate and the action or inaction of his supervisor 'contemplates proof that the supervisor's conduct led inexorably to the constitutional violation.'  *Hegarty* [,] 54 F.3d [at] 1380….Deliberate indifference, moreover, 'will be found only if it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights.  *Id.* (internal citation and quotation marks omitted).

Pineda, 533 F.3d at 54.  In order to prove deliberate indifference, Monsanto must show: "(1) a grave risk of harm [;] (2) [O'Donnell's] actual or constructive knowledge of that risk[;] and[,] (3) [O'Donnell's] failure to take easily available measures to address the risk." Rochleau v. Town of Millbury, 115 F.Supp. 2d 173, 181 (D. Mass. 2000) (citation omitted).

The standard for supervisory liability has been categorized as a "high burden [;]" id. and an "exceptionally stringent" standard.  *See,* Trinidad v. City of Boston, 2010 WL 2817186, *12 (D.Mass. 2010), citing Young v. City of Providence, 404 F.3d 4, 28 (1st Cir. 2005).  The First Circuit has repeatedly "stressed the importance of showing a strong causal connection between the supervisor's conduct and the constitutional violation." Ramirez-Lluveras, 759 F.3d 10, 19 (1st Cir. 2014).  *See also* Bowen v. City of Manchester, 966 F.2d 13, 21 (1st Cir. 1992)(rejecting claim of supervisory liability against police chief arising out of holding cell suicide cast against record of a prior suicide in holding cell, failure to install video monitoring system to view cells, failure to train on suicide screening and failure to staff station properly).

The Supreme Court has imposed a high burden on parties seeking to recover against supervisory personnel for an alleged failure to train under 42 U.S.C. 1983.  In City of Canton v. Harris, 489 U.S. 378, 379 (1989) the Court instructed that there are only "limited circumstances in

which an allegation of a 'failure to train' can be the basis for liability under § 1983." Governmental culpability is at its most tenuous when the claim turns on a failure to train. Connick v. Thompson, 563 U.S. 51, 60 (2011).

In Connick, supra, a jury found that the Orleans Parish District Attorney's Office had violated Thompson's rights under Brady v. Maryland, 373 U.S. 83 (1963). The Supreme Court held that the section 1983 case had improperly gone to the jury because, absent a showing of a pattern of Brady violations, Thompson had not shown that Connick "was on actual or constructive notice of, and therefore deliberately indifferent to, a need for more or different Brady training." 563 U.S. 58. The Court rejected the notion that a "showing of obviousness can substitute for the pattern of violations ordinarily necessary to establish municipal culpability," Id., and held that the district court "should have granted Connick judgment as a matter of law on the failure-to-train claim because Thompson did not prove a pattern of similar violations that would 'establish that the policy of inaction [was] the functional equivalent of a decision by the city itself to violate the Constitution." Id. at 61-62 (citations omitted).

The instant case is unfolding much like Noble v. City of Camden, 112 F.Supp. 3d 208 (D.N.J. June 29, 2015), yet another case where Richard Rivera offered the same tortured theory of liability as he does in the case *sub judice*. In granting summary judgment for the City on a failure to train theory, that Court wrote "[a]lthough Mr. Rivera stated in his report that Defendant failed to properly train and supervise its officers, his report makes no mention of what training or supervision was even provided by the Police Department on arrests and use of force, or the substance or frequency of the training. Nor has Plaintiff identified the precise deficiency in training or how the deficiency contributed to a violation of Plaintiff's constitutional rights, as required by the Supreme Court and this Circuit," citing to Colburn v. Upper Darby Twp., 946 F.2d

1017, 1030 (3d Cir. 1991)(emphasizing that plaintiff "must identify a failure to provide specific training that has a causal nexus with his or her injury and must demonstrate that the failure to provide that specific training can reasonably be said to reflect a deliberate indifference to whether constitutional deprivations of the kind alleged occur"); and Lapella v. City of Atlantic City, No. 10-2454, 2012 WL 2952411, at *6 (D.N.J. July 18, 2012)(to sustain an inadequate training theory, plaintiff must identify the precise deficiency in training); and Malignaggi v. Cnty. Of Gloucester, 855 F.Supp. 74, 77 (D.N.J. 1994)(stating same).   Since the Plaintiff in Noble, supported by Rivera's conclusory testimony, failed to identify any deficiency in training, summary judgment was granted for the City.

To succeed, then, Monsanto must prove more than mere negligence, or that his expert might have done things a different way.  He must show that Colonel O'Donnell was deliberately indifferent in failure to train officers, based on knowledge of prior similar acts.  In City of Canton, the plaintiff had alleged that due to the inadequacy of police training, the City of Canton and its officials violated plaintiff's constitutional right to receive medical attention while in police custody.  489 U.S. at 382.  After the jury ruled in the plaintiff's favor, the city made a motion for judgment notwithstanding the verdict, claiming that a municipality can only be found liable under section 1983 where the policy in place is itself unconstitutional. In rejecting the city's narrow interpretation of section 1983, Canton established the following standard for evaluating valid policies alleged to have been unconstitutionally applied:

> The inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police came into contact. . . . Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983 . . . . Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined

by our prior cases—can a city be liable for such a failure under § 1983. Id. at 388-89 (emphasis added).

The justices in Canton also recognized that "[A]dequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the [agency] liable." 489 U.S. at 391.  Thus, for liability to stem from a failure to train, Monsanto must show an actual policy of inadequate training, where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Id. at 390.  *See also* Tambolleo v. West Boylston, 613 N.E. 2d 127, 130; 34 Mass. App. CT 526, 530 (1992).   He must also demonstrate that Colonel O'Donnell deliberately chose an inadequate training program. Id. at 389.  Additionally, Monsanto would have to show that Colonel O'Donnell either knew or should have known that the troopers' conduct would result in a violation of a constitutional right.  Clancy v. McCabe, 805 N.E.2d 484, 490 (Mass. 2004).

The "deliberate indifference" standard has been broken down into three elements:

(1) that a policymaker … knows to a moral certainty that its employees will confront a given situation;

(2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and

(3) that the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights.

Smith v. Town of E. Haven, 2005 U.S. Dist. LEXIS 4544 (D. Conn. 2005) citing Nicholson v. Scoppetta, 344 F.3d 154, 166 (2d Cir. 2003) (citations omitted).

"Absent any showing of previous harm arising from this training policy, or any evidence of deliberation on the [defendants'] part, plaintiff fails to demonstrate an issue of material fact as to whether the Defendants actually chose a policy with deliberate indifference toward"

constitutional rights of individuals. <u>Ms. K v. City of S. Portland</u>, 407 F. Supp. 2d 290, 297 (D. Me.

2006).

> In this specific context, a showing of deliberate indifference generally requires "a
> showing 'of more than a single instance of the lack of training or supervision
> causing a violation of constitutional rights.' "[A] plaintiff [must] demonstrate 'at
> least a pattern of similar violations' arising from training or supervising "that is so
> clearly inadequate as to be 'obviously likely to result in a constitutional violation.'
> A limited exception for single-incident liability exists only "where the facts giving
> rise to the violation are such that it should have been apparent to the policymaker
> that a constitutional violation was the highly predictable consequence of a particular
> policy or failure to train."

<u>Brumfield v. Hollins</u>, 551 F.3d 322, 329 (5th Cir. 2008) (citations omitted).

Not surprisingly, Monsanto offered only conclusory statements in discovery to support this

claim. The expert testimony offered by Rivera contains only conclusory statements with absolutely

no foundation: "troopers are expected to understand the rules, regulations and training and abide

by that.  When an officer doesn't abide by his own training, there could be a training failure."

(Rivera depo. 140).  To the contrary, Rivera not only fails to identify specific deficiencies, he

agrees that the policies of the Rhode Island State Police are adequate, that the training materials

used were adequate, and that the in-service training was adequate. (Rivera depo. 142, 148-149).

Rivera's support for the failure to train claims is his facile assumption that if the troopers were

trained properly, the wouldn't violate policy.  This is akin to a strict liability theory, which is far

from the Supreme Court's instruction in <u>Monell</u>, <u>Canton</u> and their progeny.

In this case, the State submit that the undisputed facts fail to support a finding of deliberate

indifference that led to Monsanto's alleged injuries. In particular, there is no basis to support the

conclusion in the first instance that any harm had resulted in the past from this alleged deficient

training or 'at least a pattern of similar violations' arising from training or supervising "that is so

clearly inadequate as to be 'obviously likely to result in a constitutional violation.' <u>Brumfield</u>, 551

F.3d at 329. Absent such alleged prior harm or even an allegation of such harm, Monsanto cannot meet his burden of showing that the State "actually chose a policy with deliberate indifference toward the constitutional rights of individuals." Ms. K v. City of S. Portland, 407 F. Supp. 2d at 297.Monsanto has not come close to presenting a triable issue of supervisory liability under section 1983 against Colonel O'Donnell.  Summary judgment is thus appropriate as to Count IV.

**F.   The Officers Had Cause To Stop And Later To Arrest Lionel Monsanto, Therefore, His State-Law Claims Of Malicious Prosecution, False Arrest And False Imprisonment Contained In Counts VI and VII Cannot Survive Summary Judgment.**

As stated above, Monsanto's claims against Palmer all stem from the initial traffic stop and subsequent roadside arrest.  His behavior afterwards supported charging him with disorderly conduct[13], obstructing an officer in execution of duty[14] and simple assault.[15]  It is undisputed that Palmer played no part in the charges brought against Monsanto.

For the state law claims based on the arrest and subsequent detention, the Court turns to the Rhode Island Supreme Court for guidance.  Count VI alleges a cause of action for malicious prosecution against Troopers Taylor and Palmer.  To establish such a claim under Rhode Island

---

[13] R.I. Gen. Laws § 11-45-1 provides the following definition:
(a) A person commits disorderly conduct if he or she intentionally, knowingly, or recklessly:

(1) Engages in fighting or threatening, or in violent or tumultuous behavior;
(2) In a public place or near a private residence that he or she has no right to occupy, disturbs another person by making loud and unreasonable noise which under the circumstances would disturb a person of average sensibilities;
(3) Directs at another person in a public place offensive words which are likely to provoke a violent reaction on the part of the average person so addressed…

[14] R.I. Gen. Laws § 11-32-1 provides that "[e]very person who shall obstruct any officer, civil, military, or otherwise, including any state, city or town police deputy sheriff or fire fighter, while in the execution of his or her office or duty, shall be imprisoned not exceeding one year or be fined not exceeding five hundred dollars ($500).

[15] An assault is an unlawful attempt or offer, with force or violence, to do a corporal hurt to another, whether from malice or wantonness.  State v. Pope, 414 A.2d 781 (R.I. 1980).

law, a plaintiff must prove four elements: "(1) the initiation of a criminal proceeding against the person who is now the tort plaintiff; (2) the termination of that previous proceeding in said person's favor; (3) a lack of probable cause on defendant's part when they initiated the criminal proceeding; and (4) the existence of malice on defendants' part." Henshaw v. Doherty, 881 A.2d 909 (R.I. 2005)(citations omitted). Malicious prosecution actions are disfavored because "they tend to deter the prosecution of crimes and/or to chill free access to the courts." Clyne v. Doyle, 740 A.2d 781, 782 (R.I. 1999)(citation omitted). As probable cause to arrest is a complete defense, Monsanto is tasked to "establish the existence of malice and want of probable cause by clear proof." Id. As there is no evidence of ill will or hostility on Palmer's part, a malicious prosecution claim against him cannot survive.

The essential element of a false arrest claim is the restraint of another person without legal justification or without any color of legal authority. Henshaw, 881 A.2d at 919. Henshaw makes it clear that a false arrest claim is a specific intent tort. In Horton v. Portsmouth Police Department, this State's highest Court explained that "the existence of probable cause is a complete defense to a false arrest claim.'' 22 A.3d 1115, 1122 (R.I. 2011). In conducting the probable cause analysis in this state law claim, Horton provides guidance:

> Probable cause is determined under a flexible 'totality-of-circumstances' analysis. Accordingly, establishing the existence of probable cause to arrest a person does not require the same degree of proof needed to determine whether that person is guilty of the crime in question.

Id. (internal citations omitted).

The existence of probable cause may be determined as a matter of law at the summary judgment stage. Henshaw 881 A.2d at 917. "[A] lack of probable cause will not be inferred…from the single fact that the plaintiff was acquitted from the charge lodged against him." Horton, supra, 22 A.3d at 1123 n. 7. Because, as explained above, probable cause existed for

Monsanto's arrest, the fact that the Attorney General decided to dismiss the charges provides no legal support for the claim of malicious prosecution, and summary judgment should enter.

A cause of action for false imprisonment can only be maintained where the imprisonment is improper or unjustified.  To be successful, Monsanto must show *more* than that (1) the defendant intended to confine him, (2) the plaintiff was conscious of his confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.  The plaintiff must also show that he or she was detained without legal justification.  Dyson v. City of Pawtucket, 670 A.2d 233, 239 (R.I. 1996).  Here, there was legal justifications to detain Monsanto, based on the admittedly expired license.

Monsanto's repeated protestations that he could not be arrested for having a long-expired license were wrong,  and he had no "right" to resist the arrest.  R.I. Gen. Laws § 12-7-10.  In Atwater v. City of Lago Vista, 532 U.S. 318 (2001) the United States Supreme Court affirmed the grant of summary judgment in a case alleging constitutional violations against a city, its police chief and an arresting officer.  There, the motorist was arrested, handcuffed and taken to jail for failing to wear her seat belt, failing to fasten her children in seat belts, driving without a license and failing to provide proof of insurance.  Although the failure to put seatbelts on the children was a misdemeanor punishable only by fine under Texas law, the Court determined that the arrest for that offense did not violate the Fourth Amendment (or, by extension, constitute false arrest or malicious prosecution).  After reviewing the long history of police authority to arrest individuals for misdemeanors, the Court held that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."  121 S.Ct. at 1557.

Here, speed provided reasonable suspicion for the initial stop, and the long-expired license coupled with Monsanto's obstructionist behavior provided probable cause to arrest. There is nothing that would justify allowing a jury to consider any of the three state law claims contained in Counts VI and VII as to Trooper Palmer.

**G.   Jurisdiction Of A "Racial Profiling" Case Under Rhode Island Law Is Vested Exclusively In The Superior Court.  Further, There Is No Evidence Of Discriminatory Animus To Support A Finding That Palmer Violated Either Rhode Island's Racial Profiling Prevention Act or the Racial/National Origin Intimidation Statute, and Counts IX and X Should Be Summarily Dismissed**

Counts IX and X of the Complaint allege a violation of R.I. Gen. Laws §§ 9-1-35 and 31-21.2-3, respectively.  Rhode Island's Racial Profiling Prevention Act, R.I. Gen. Laws § 31-21.2-3 prohibits "racial profiling," which in turn is defined as "the detention, interdiction or other disparate treatment of an individual on the basis, in whole or in part, of the racial or ethnic status of such individual…."  R.I. Gen. Laws 9-1-35 provides a civil action for ethnic or religious intimidation when he or she is "*maliciously* subjected to an act or acts which would reasonably be construed as intended to harass or intimidate the person *because of* his or her race, religion or national origin…." (emphasis added).  Section 9-1-35 may be brought against anyone, and section 31-21.2-3 is exclusive to law enforcement officers and agencies.  The General Assembly provided exclusive jurisdiction of a civil cause of action under these laws in the state's Superior Court. Therefore, this court lacks jurisdiction and the claims based on these statutory sections should be dismissed.  This exclusive jurisdiction in Superior Court also implicates the Eleventh Amendment, which operates to make unconsenting States immune from suits brought in Federal Court by their own citizens, as well as by citizens of another state.  Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. 299. 304 (1990).    The test for determining whether the State has waived its Eleventh Amendment immunity from suit in Federal Court is "a stringent one."  Bergemann v. State of R.I.,

676 F.Supp. 2d 1, 5 (D.R.I. 2009).  "Consequently, a state will be deemed to have waived its immunity 'only where stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction." Id. (quoting Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 254 (1985)).  Here, it is clear that the State waived its immunity only to suits in state court.  No action can therefore be maintained in this court against either trooper or the State.

Further, Monsanto's cursory allegations that the troopers violated two Rhode Island statutes prohibiting intentional harassment and intimidation of an individual on account of race cannot withstand examination under the summary judgment standard, as he offers nothing but conclusions and assumptions not supported by any fact.  Evidence of discriminatory intent is necessary to allow these counts to go to a jury.  While the First Circuit has acknowledged that discriminatory animus seldom "wears its garb openly" and more often comes "masked" in "subtle forms," Lopera, 640 F.3d at 403 (citations omitted), in order to survive summary judgment, Monsanto must make more than "conclusory allegations, improbable inferences, or unsupported speculation."  Id. (citation omitted).  Monsanto must "set forth specific facts showing that there is a genuine issue for trial."  Id. (citation omitted).

The Racial Profiling Prevention Act allows for a cause of action "[u]nless there exists reasonable suspicion or probable cause of criminal activity."  R.I. Gen. Laws 31-21.2-5.  If reasonable suspicion exists (and especially if it later turns into probable cause) no action will lie under the statute.  Estrada v. Rhode Island, 594 F.3d 56 (1st Cir. 2010)(holding that since officer could reasonably have believed that he had sufficient facts to warrant first reasonable suspicion, and later, probable cause of a crime, officer was entitled to qualified immunity for all of the challenged actions with respect to the Act).  As established above, reasonable suspicion supports

the initial motor vehicle stop, and there was probable cause to arrest on the admittedly expired license, as well as the other charges.

As in <u>Lopera</u>, Monsanto has failed to "present such specific facts on the issue of racial animus in this case." <u>Id.</u>  Indeed, the evidence was much stronger in <u>Lopera</u>, where players and fans hurled racial slurs at high school students during and after a soccer game.  After the game the crowd became unruly and several police vehicles arrived and later searched the visiting team's locker room for allegedly stolen items.  The visiting players were all Hispanic, the home team mostly white.  The allegations were that the police did little to protect the high-schoolers and that the search was unconstitutional.  The First Circuit found that the visiting players were "regrettably…subject to ethnic animosity" from the crowd, but noted that there was "no evidence that all officers of reasonable competence would have believed the search was undertaken because of the national origin or race of the players." <u>Id.</u>  The First Circuit found that the allegations failed to state a claim under either 9-1-25 or 31-21.2-3, and upheld summary judgment in favor of the officers involved.

In <u>Estrada v. Rhode Island</u>, <u>supra,</u> the First Circuit upheld the dismissal of an action based on R.I. Gen. Laws 31-21.2-5 on qualified immunity grounds.  That Court wrote that "[b]ecause we find that [the Officer] could reasonably have believed that he had sufficient facts to warrant first reasonable suspicion and later, probable cause of immigration violations, we find that he is entitled to qualified immunity for all of the challenged actions with respect to the Act."  594 F.3d at 68.

In this case, the troopers had reasonable suspicion to pull the Monsanto vehicle to the side of I-95 in the early morning hours of February 26, 2014, as they both observed him speeding.  Palmer's role in the incident was limited:  he was not driving the cruiser, was the junior trooper, and stayed at the back of the vehicle once it was stopped on I-95 for officer safety.  His

uncontradicted testimony is that he did not know that the occupants of the vehicle were African American until he got out of his car on the side of I-95 and approached Monsanto's vehicle.  He did not make the decision to arrest.

Taylor testified that if he observes a vehicle speeding and he believes that they may be impaired, he will pull that vehicle over.  Both troopers testified that just before it was pulled over, the vehicle was speeding, and that when pulled over a routine computer check revealed that Monsanto's drivers' license was expired—and had been for two years. Data obtained at the scene revealed that Monsanto had been given a warning about his expired license before.  Clearly, then Monsanto showed a pattern of rejecting his responsibility to comply with the law.

Perhaps most indicative of the officers' intent, was the paperwork Taylor was going to give Monsanto which would have allowed him to leave and appear later at the Rhode Island Traffic Tribunal for a hearing. (Exh. L). However, Monsanto's obstructionist behavior in hampering the troopers' ability to do their job led to his eventual arrest, transport and detention.  The facts support that the eventual travel of the case was caused by Monsanto's own actions, and was not because of the color of his skin.  Further, he has offered nothing even suggesting that Palmer acted intentionally or maliciously that evening.  Therefore, summary judgment is appropriate as to Trooper Palmer on Counts IX and X.

**H.  Count XI Is Superfluous And Cannot Survive Summary Judgment.**

Count XI alleges that Palmer racially profiled Monsanto in violation of the Fourteenth Amendment and alleges a cause of action based on 42 U.S.C. 1983.  The prohibitions on racial profiling are a state law claim, as discussed above.  As such, no federal claim lies.  <u>Meehan v. Town of Plymouth</u>, 167 F.3d 85 (1st Cir. 1999).  The Fourteenth Amendment prohibits a State from depriving any person to "life liberty or property without due process of law."  The Fourth

Amendment is satisfied if an officer's action in initiating an investigatory stop is supported by reasonable suspicion that criminal activity may be afoot.  Terry v. Ohio, 392 U.S. 1 (1968).  For all of the factual and legal reasons argued above, no such "racial profiling" cause of action can be maintained against Trooper Palmer.

### I.   Counts XII and XIII Do Not State A Cause Of Action And Should Not Be Presented To A Jury.

These two counts allege "Respondeat Superior" against the State of Rhode Island, presumably aimed at obtaining a judgment against the State related back to Count IV, supervisory liability premised under 42 U.S.C. 1983 against Colonel O'Donnell, and Count V, which is assault and battery against Trooper Taylor.  Respondeat superior is not a stand-alone cause of action, rather, it is a means to obtain a judgment against an employer, supervisor or principal for the acts of another acting on its behalf.  The reasons why this concept cannot provide a vehicle for State liability in this case have been argued above, and are incorporated herein.  Further, since excessive force by a police officer is not "within the course and scope" of employment, there can be no imposition of liability on the State for the actions of Trooper Taylor.  Cruz v. Town of North Providence, supra.  There, the Rhode Island Supreme Court held that "[a]n employer, such as a municipality, can be held liable for an employee's intentional tort committed against a third party only if the misconduct falls within the scope of employment."  833 A.2d at 1240 (emphasis added).  Applying this rule of law to a situation where a police officer committed an assault and battery— as here—the Rhode Island Supreme Court held that "[a]cts of police brutality, however, whether committed by one or more police officers, do not generally fall within the scope of their employment."  Id. at 1240 (citing Bryant v. Mullins, 347 F.Supp. 1282, 1284 (W.D. Va. 1972)("[T]he use of excessive force by a police officer is not within the scope of his duty or employment.").  The Rhode Island Supreme Court determined that the Town of North Providence

could not be held liable under a respondeat superior theory of liability when the assault and battery of its police officer were not within the scope of employment. *See also,* Sanzi v. Shetty, 864 A.2d 614 (R.I. 20050(to determine course and scope, look to the acts and circumstances surrounding alleged assault); Aldrich v. Tripp, 11 R.I. 141 (1875)(city appointing police officer not liable for officer's assault and battery). Finally, the Rhode Island Supreme Court has written of this case that "the information before the Attorney General supports the decision that Trooper Taylor's conduct fell outside the scope of his employment as a Rhode Island State Trooper and that a jury could conclude that he acted willfully." State of Rhode Island v. Rhode Island Troopers' Assoc., ___ A.3d ___, 2018 WL 3131462 (R.I. June 27, 2018).

As the concepts in these "causes of action" are contained in other parts of the Complaint, as since they cannot survive summary judgment scrutiny, this Motion should be granted as to Counts XII and XIII.

### J.  The State And Official Capacity Defendants Cannot Be Found Liable For Punitive Damages As A Matter Of Law.

Punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct. City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 266-67 (1981). Public policy dictates that punitive damages are not properly awarded against governmental defendants, as it is the taxpayers who would ultimately be punished. Id. *See also* Graff v. Motta, 695 A.2d 486, 490 (R.I. 1997). No such claim should be allowed to proceed in this matter.

## V.  CONCLUSION

For the foregoing reasons, the State Defendants respectfully request that Summary Judgment enter in their favor.

Respectfully Submitted,

STATE OF RHODE ISLAND
By Its Attorneys,

PETER F. KILMARTIN
ATTORNEY GENERAL

*/s/ Rebecca Tedford Partington*
_____
Rebecca Tedford Partington , #3890
Chrisanne Wyrzykowski, #7565
Assistant Attorneys General
150 South Main Street
Providence, RI  02903
(401) 274-4400 ext. 2303/2235
(401) 222-2995 Fax
rpartington@riag.ri.gov
cwyrzykowski@riag.ri.gov

<u>CERTIFICATION</u>

I, the undersigned, hereby certify that I filed the within Memorandum via the ECF filing system and that a copy is available for viewing and downloading.  I have also caused a copy to be sent via the ECF System to the following attorneys of record on this 9th day of July, 2018.

Robert J. Caron, Esq.
478A Broadway
Providence, RI 02909
rcaron@robertjcaronlaw.com

Kevin Braga, Esq.
The Law Offices of Kevin P. Braga
2095 Elmwood Avenue, Suite B
Warwick, RI 02888
kevin@kpbragalaw.com

John T. Martin, Esq.
KJC Law Firm LLC
10 Tremont Street, 6th Floor
Boston, MA 02108
mjc@olenn-penza.com

Michael B. Forte, Esq.
Olenn & Penza
530 Greenwich Avenue
Warwick, RI 02886
mbf@olenn-penza.com

*/s/ Rebecca Tedford Partington*
_____

38